**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RICHARD KNORR INTERNATIONAL,** ) | |
| **LTD., and RICHARD KNORR, Individually,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No.  08 C 5414** |
| **v.** ) | |
| ) | |
| **GEOSTAR, INC., a foreign corporation,** ) | **HONORABLE DAVID H. COAR** |
| **MACAO DEVELOPMENT COMPANY, a** ) | |
| **foreign corporation, ROCO KI** ) | |
| **MANAGEMENT, INC., a foreign** ) | |
| **corporation, ROCO KI SERVICES, INC., a** ) | |
| **foreign corporation, MACAO BEACH** ) | |
| **RESORT, INC., a foreign corporation,** ) | |
| **ESTATES AT MACAO BEACH RESORT,** ) | |
| **INC., a foreign corporation, MACAO** ) | |
| **BEACH REAL ESTATE, INC., a foreign** ) | |
| **corporation, HACIENDAS ACQUISITION,** ) | |
| **INC., a foreign corporation, MACAO** ) | |
| **ACQUISITION, INC., a foreign corporation,** ) | |
| **and RESORT RESOURCES, INC., a foreign** ) | |
| **corporation,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Richard Knorr and Richard Knorr International, Ltd. ("RKI") have filed suit against

Geostar, Inc. and several of its subsidiary corporations for breach of contract, breach of fiduciary

duties, and constructive fraud.  Four of the remaining defendants[1]—Geostar, Inc.; Resort

Resources, Inc.; Macao Development Company; and Macao Beach Real Estate, Inc.—have

moved to dismiss the first amended complaint for lack of personal jurisdiction.  *See* Fed. R. Civ.

---

[1] Knorr voluntarily dismissed defendants Roco Ki Management, Inc.; Roco Ki Services, Inc.; Haciendas
Acquisition, Inc.; and Macao Acquisition, Inc., after they moved to dismiss for lack of personal jurisdiction.  (R.45;
R.69.)  In addition, Macao Beach Resort, Inc.; Estates at Macao Beach Resort, Inc.; and Haciendas at Macao Beach
Resort, Inc., have all conceded personal jurisdiction.

- 1 -

P. 12(b)(2). For the reasons that follow, the court DENIES the motions as to Geostar and Resort Resources and GRANTS the motions as to Macao Development Company and Macao Beach Real Estate.

## FACTS

The jurisdictional facts in this case are complex and intricate. To help put them in context, the court begins with a brief overview of the "Roco Ki" project, the relations between the numerous defendants, and the events leading up to this lawsuit. The court will fill in the details, on a defendant-by-defendant basis, as they become relevant to its analysis.

### *Overview*

In 2002, Richard Knorr and RKI, Knorr's Chicago based architectural and real-estate-development firm, RKI (collectively, "Knorr")[2] conceived of "Roco Ki," a combination of a destination resort and a residential community to be situated on the Caribbean shore of the Dominican Republic. Knorr engaged Carl Bazarian, an investment banker in Chicago, to find investors. In December 2002, Bazarian approached Richard Dortch, a Seattle based consultant with GMT Group (a subsidiary of defendant Geostar) to see if Geostar might be interested. Dortch recommended the project to Geostar's board of directors, and the board agreed. Geostar executed a bridge loan to Knorr to get the project up and running, and in October 2003, Geostar created an elaborate network of direct and indirect subsidiary companies to handle various aspects of the Roco Ki project.

From 2004-2006, with Knorr at the helm, nearly all aspects of the Roco Ki project were managed out of his Chicago office. Knorr dealt primarily with three individuals who were, in one way or another, associated with Geostar or its subsidiaries: Dortch, Sterling Crum, and

---

[2] Since nothing in the jurisdictional analysis turns on any distinction between the two named plaintiffs, the court uses 'Knorr' to refer to the individual and his firm for reasons of convenience and economy.

Andrew Caldwell. There is no dispute that these individuals spent substantial time in Chicago: Dortch and Crum made upwards of twenty trips each, and Caldwell made upwards of thirty trips, in connection with the Roco Ki project. Knorr contends that their activities in Chicago subject the defendant corporations to personal jurisdiction in Illinois. Further discussion of their role(s) and corporate affiliation(s)—a matter of some dispute among the parties—must await an introduction to the defendant corporations.

Meanwhile, in October 2006, with extensive construction underway at Roco Ki, relations began to break down, and some apparently substantial disagreements arose between Knorr and the defendants concerning "the development, financing, and overall management" of the Roco Ki venture. The parties tried to resolve their differences at a retreat in Washington state, at a home owned by the Crum family, and then at mediation sessions in Toronto, Canada and Toledo, Ohio. On April 2, 2007, in Ohio, the parties reached a settlement agreement at a mediation session conducted by retired federal judge Richard McQuade. The agreement provided, among other things, that Knorr would relinquish his equity and intellectual property in the venture, in exchange for $40,000,000 plus a beachfront estate and one or two marina slips at Roco Ki. Knorr is no longer managing the development of Roco Ki.

In 2008, Knorr filed the present suit. Count I alleges breach of the settlement agreement by various defendants. Count III alleges that all of the defendants committed constructive fraud by falsely representing to Knorr that they had the capacity to perform the agreement and by engaging in a scheme to "deplete[], dilute[], and otherwise waste[] assets" that rendered them incapable of performing the settlement agreement. Count II alleges that defendants Geostar, Macao Development Company, and Haciendas at Macao Beach Resort breached fiduciary duties to Knorr.

*Geostar and its Subsidiaries*

Geostar and all of its subsidiaries are incorporated in Nevis. They have their main office, or are otherwise administered, in Guernsey, Channel Islands. They have no offices or other permanent presence in the United States. Each subsidiary maintains its own corporate identity, with separate boards of directors, bank accounts, corporate records, and business purposes.

Geostar describes its business as "identifying hotel, resort, business and commercial property development opportunities." Once it identifies a promising opportunity, "it passes all the responsibilities for initiating, managing, and operating that development to separate, country-specific indirect subsidiary corporations."

Geostar's directors are Michael Underdown and Peter Howe. Underdown claims he has never been to Chicago except for airport layovers; Knorr claims that Underdown came to Chicago once on Roco Ki business. Underdown testified by declaration that Geostar has never granted Caldwell, Crum, or Dortch any authority to act on Geostar's behalf.

Geostar is owned by the Geo Trust, a sub-trust of the Duvall trust. Crum and his family are the beneficiaries of the Duvall trust. Crum participated extensively in the Roco Ki project both in Chicago and elsewhere, despite everyone's insistence—besides Knorr, that is—that Crum has no authority to act on behalf of Geostar or any other defendant corporation. Crum describes himself as an "adviser;" Dortch describes him as an unpaid "consultant" who enjoys helping emerging business in his semi-retirement. Knorr operated under the belief that Crum was authorized to act on behalf of Geostar or, for that matter, on behalf of any of its Roco Ki related subsidiaries.

In any event, after choosing to pursue the Roco Ki project, Geostar "caused the

incorporation of a series of direct and indirect subsidiary companies" to carry out the project. Among those subsidiaries were the so-called Roco Ki Operating Companies: Macao Beach Resort ("MBR"), Estates at Macao Beach Resort ("EMBR"), and Haciendas at Macao Beach Resort ("HMBR"). The Operating Companies were formed in October 2003 to carry out the initial phase of the Roco Ki project, which was to include a Westin Resort and residential properties situated next to a Nick Faldo Signature Golf Course, on land owned by the Operating Companies and known as "Parcel A." Among the original directors of the Operating Companies was Dortch. Knorr became a co-director on April 21, 2005. Neither Crum nor Caldwell has served as a director or officer of any of the Operating Companies; Dortch testified by declaration that the Operating Companies have never granted either Crum or Caldwell any authority to act on their behalf.

Since the nuts and bolts of Parcel-A development were in the hands of the Operating Companies, who conducted extensive business with Knorr in Chicago, the Operating Companies have conceded personal jurisdiction. The remaining defendants contend that the Operating Companies were the only defendants to transact any business or have any presence in Chicago.

Macao Beach Real Estate ("MBRE") was incorporated to purchase an option to buy an additional 2000 acres of land adjacent to Parcel A; MBRE exercised that option in September 2006. The MBRE land, also known as "Parcels B-E," is not part of the initial phase of Roco Ki development. Although Knorr designed a "comprehensive master plan" for the MBRE land, that plan was preliminary; there has been no development of the MBRE land except for a main entrance, access road, and Infrastructure Center that services the land owned by the Operating Companies. These costs were billed to the Operating Companies and to the Roco Ki Infrastructure Account, not to MBRE. No contracts have been undertaken in connection with the

development of the MBRE land.  Dortch was among MBRE's original directors, and Knorr

served as a co-director from February 28, 2007 to March 9, 2009.  Neither Crum nor Caldwell

has served as a director or officer of MBRE; again, Dortch testified by declaration that MBRE

has never granted either Crum or Caldwell any authority to act on its behalf.

Macao Development Company ("Macao") is a subsidiary of Dominicana, which is a

direct subsidiary of Geostar.  Macao was incorporated in October 2003 as a holding company

whose purpose is "to facilitate transactions involving the stock of the operating companies rather

than their assets."  The directors of Macao are Underdown and Peter Howe.  Neither Crum nor

Caldwell nor Dortch has served as a director or officer of Macao; Underdown testified by

declaration that Macao has never granted any of them any authority to act on its behalf.

Resort Resources ("Resources") was incorporated in April 2005 and is now known as

Grupo Roco Ki.  Resources provides financial and accounting services for the Roco Ki project as

a whole, such as managing payroll and allocating soft costs among the other subsidiary

corporations.  Its directors are Dortch and Nick Tawil.  Neither Crum nor Caldwell has served as

a director or officer of MBRE, and, according to Dortch's declaration, MBRE has never granted

either Crum or Caldwell any authority to act on its behalf.  However, Caldwell does serve as a

"consultant" or "independent contractor" for Resources.

## LEGAL STANDARD

The plaintiff bears the burden of showing that the court has personal jurisdiction over a

non-consenting defendant.  *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773,

782 (7th Cir. 2003).  When the court rules on a Rule 12(b)(2) motion "based on the submission

of written materials, without the benefit of an evidentiary hearing," the plaintiff "need only make

out a *prima facie* case of personal jurisdiction."  *Id.*  In determining whether the plaintiff has

done so, the court draws all reasonable inferences in favor of the plaintiff.  *Id.*

A federal court sitting in diversity applies the law of personal jurisdiction of the state in which it sits.  *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002).  An Illinois court may exercise specific jurisdiction on any basis that comports with the due-process guarantees of both the U.S. and Illinois Constitutions.[3]  735 ILCS § 5/2-209(c); *see also Rollins v. Ellwood*, 565 N.E.2d 1302 (Ill. 1990); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276-77 (7th Cir. 1997).  While the Illinois Supreme Court has instructed that these guarantees are not necessarily coextensive, *see Rollins*, 565 N.E.2d at 1316, a case has yet to emerge where due process was satisfied under the U.S. but not the Illinois Constitution.  So for all practical purposes, the law governing specific jurisdiction in Illinois is the minimum-contacts framework originally set forth in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  *See Citadel Group, Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008).

## ANALYSIS

Since personal jurisdiction is a defendant-specific inquiry, Knorr must show that each defendant, taken individually, has sufficient minimum contacts with Illinois to satisfy due process; he may not simply aggregate the defendants' contacts under the general rubric of the Roco Ki project.  *See Kinslow v. Pullara*, 538 F.3d 687, 693 (7th Cir. 2008).  Thus, the appropriate inquiry is whether—and if so, to what extent, and by whom—activities within the scope of each defendant's particular corporate function(s) were carried out in Chicago.

### *Minimum Contacts: Geostar*

Although his argument is inchoate, Knorr in effect claims that the court may exercise personal jurisdiction over Geostar because it is the parent company of all the subsidiaries that

---

[3] Knorr has not argued that general jurisdiction exists over any of the defendants and has therefore waived any such argument.  Accordingly, the court confines its analysis to specific jurisdiction.

carried out the Roco Ki venture on the ground. Knorr has consistently maintained, in his briefs and in his deposition, that everything that happened in connection with Roco Ki was ultimately Geostar's business. In his brief, Knorr sets forth Geostar's own admission that it "caused the incorporation of a series of direct and indirect subsidiaries to handle the development of the Roco Ki project" as a basis for personal jurisdiction. (Decl. Underdown ¶3.) The court agrees.

As a general rule, jurisdiction over a parent company may not be based merely on its subsidiary's contacts with the forum. *Purdue Research Found.*, 338 F.3d at 788 n.17. Geostar contends that Illinois recognizes only one exception to this general rule: a subsidiary's contacts will be imputed to the parent when the parent and subsidiary have failed to observe corporate formalities or there is some other basis for piercing the corporate veil. *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 904 N.E.2d 1050, 1062 (Ill. App. Ct. 2009); *IDS Life Ins. Co. v. Sun America Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998). Since Knorr has offered no evidence to support such a conclusion, Geostar concludes that that is the end of the matter.

Geostar ignores a second exception to the general rule: Illinois courts will exercise jurisdiction over a parent company on the basis of a subsidiary's contacts when the subsidiary "is conducting the parent's business rather than its own." *Alderson v. Southern Co.*, 747 N.E.2d 926, 944 (Ill. App. Ct. 2001) (discussing *Maunder v. De Havilland Aircraft of Canada, Ltd.*, 466 N.E.2d 217 (Ill. 1984)); *see also IDS Life Ins.*, 136 F.3d at 541. This so-called *Maunder* theory of jurisdiction does not require any basis for piercing the corporate veil. *Old Orchard*, 904 N.E.2d at 1059. It may be used to establish either general or specific jurisdiction over the parent company. *Id.*

Under *Maunder*, the critical question is whether the subsidiary that has sufficient contacts with the forum "exists for no purpose other than conducting the business of its parent." *Id.* The

test is not whether the parent exercises some measure of control over the subsidiary, or whether the parent and subsidiary share officers or directors. *Id.* Rather, the parent must be "attempting to shield itself from lawsuits by conducting its own business through the legal fiction of 'separate' subsidiaries." *Id.* at 1060; *see also IDS Life Ins.*, 136 F.3d at 541 ("[A] corporation should not be able to insulate itself from the jurisdiction of the states in which it does business by the simple expedient of separately incorporating [its various operations]."). For instance, the parent corporation may be "merely a holding company that has established many subsidiaries to carry out its business." *Alderson*, 747 N.E.2d at 945. Or it may be an "umbrella company" that forms several subsidiary corporations "merely to bid on projects or investments, merely for tax purposes, or to own the assets" through which the parent conducts its business ventures. *Id.*

Geostar is subject to personal jurisdiction under *Maunder*. The court's jurisdiction over the Roco Ki Operating Companies (MBR, EMBR, HMBR) is not in dispute. Geostar formed these (and other) subsidiaries to carry out the Roco Ki project. Underdown, a Geostar director, testified by declaration that "[i]n October 2003, Geostar caused the incorporation of a series of direct and indirect subsidiaries to handle the development of the Roco Ki project." (Decl. Underdown ¶3.) Thereafter, the Operating Companies became the principal participants in "contracts, planning, sales, marketing, or negotiations for the Roco Ki project." (Decl. Dortch ¶3.) As Underdown testified, "Geostar is in the business of identifying hotel, resort, business and commercial property development opportunities. Once Geostar identifies a promising development, however, it passes all the responsibilities for initiating, managing, and operating that development to separate, country-specific indirect subsidiary corporations." (Decl. Underdown ¶3.)

On Underdown's own telling, Geostar formed the Operating Companies (to say nothing

of the other subsidiaries) for the sole purpose of carrying out a development opportunity that
Geostar had selected and that Geostar had chosen to pursue.  There is absolutely no suggestion
that the Operating Companies, or any other Geostar-subsidiary defendants, have any business
purpose beyond carrying out the Roco Ki related functions for which Geostar created them.  Far
from being a series of freestanding businesses that Geostar just happens to own, the subsidiary
companies are nothing but Geostar's attempts to cabin off various aspects of its own business
venture for legal and financial purposes.  And as Dortch has testified, in his role as a consultant
for GMT Group, he "recommended that *Geostar* pursue the Roco Ki project, and the board of
directors of *Geostar* agreed."  (Decl. Dortch ¶2; emphases added.)  So Geostar executed a bridge
loan to RKI to get the project off the ground (Decl. Underdown ¶2) and immediately began
distributing responsibilities and assets relating to Roco Ki among its intricate network of
subsidiary corporations.  From these uncontested facts, the court concludes that Roco Ki was
undertaken as Geostar's "own business."  The subsidiary corporations to which Geostar "passed
all the responsibilities" were its own offspring, and it may not now disown them, or the business
they conduct on its behalf, for the purpose of defeating personal jurisdiction.  *See Old Orchard*,
904 N.E.2d at 1060; *IDS Life Ins.*, 136 F.3d at 541.  Geostar's imputed contacts are sufficient for
specific jurisdiction; there is no need to take up Knorr's further argument that Crum, Dortch, and
Underdown's activities in Chicago also give rise to minimum contacts for Geostar.

### Minimum Contacts: Macao Development Company ("Macao")

Knorr's brief advances two arguments for personal jurisdiction over Macao: (1) Macao
conducted "sales operations" in Chicago, in which Dortch and Crum participated; (2) Macao is a
subsidiary of Geostar and a holding company that owns shares in HMBR.  These arguments fail
to provide a basis for jurisdiction over Macao.

*First*, the record belies Knorr's claim that Macao conducted sales operations in Chicago; it shows, rather, that HMBR did. HMBR develops residential properties on Parcel A at Roco Ki; there is no dispute that HMBR properties were actively marketed, and designed by Knorr, in Chicago. (Dep. Knorr at 287:5-289:20.) But that does not show that Macao was implicated in these sales in a way that would subject it to jurisdiction in Illinois. When asked about Macao's connection to Chicago based efforts to sell HMBR properties, Knorr responded that Crum and Dortch met with architects and interior designers in Chicago who were engaged in connection with the HMBR properties, and that they actively reviewed cost estimates and construction budgets for the properties. (*Id.* at 290:5-18.) Yet Knorr does not dispute that Macao is a holding company whose function is "to facilitate corporate transactions involving the stock of the operating companies rather than their assets." (Decl. Underdown ¶7; Dep. Knorr at 286:14-287:4.) It is entirely unclear why a holding company that does nothing but own stock would be charged with participation in "furniture selection" or even cost accounting. (*Id.* at 290:10.) Assuming *arguendo* that Crum and Dortch were, as a general matter, authorized to act on behalf of Macao, Knorr still has not provided any basis for his conclusion that Macao—as opposed to HMBR—sold HMBR properties in Chicago.

*Second*, Macao's status as a subsidiary holding company with shares in HMBR does not provide any basis for personal jurisdiction. The mere fact that Macao is a subsidiary of Geostar, or more precisely, a subsidiary of Dominicana, which is a subsidiary of Geostar, is not enough. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary"). Similarly, the fact that Macao owns shares in HMBR is insufficient unless there is a basis for piercing the corporate veil *or* HMBR was formed by Macao merely to conduct Macao's own

business.  *See IDS Life Ins.*, 136 F.3d at 540-41.  There is, again, no evidence to suggest a

breakdown of corporate formalities between these or any other defendants, and HMBR was not

formed by Macao in the first place; rather, HMBR and Macao were both formed as subsidiaries

of Geostar.  Thus, Knorr cannot exploit *Maunder* to impute HMBR's jurisdictional contacts to

Macao.  Lastly, Knorr stresses that he was also given equity in HMBR, which makes Macao his

co-shareholder.  This fact is irrelevant.  The court lacks jurisdiction over Macao.

### Minimum Contacts: Macao Beach Real Estate ("MBRE")

Knorr's brief presents two reasons why MBRE is subject to personal jurisdiction in

Illinois: (1) Knorr provided extensive services to MBRE in Chicago; (2) Dortch conducted

substantial business on behalf of MBRE in Chicago.  These reasons are inadequate.

*First*, there is no dispute that Knorr spearheaded the master planning for the eventual

development of the MBRE parcels.  This was a multifaceted endeavor spanning brand

development, marketing, environmental engineering, legal and financial coordination, and many

other activities.  (Dep. Knorr at 65:21-69:10.)  For instance, Knorr testified that he created

intellectual property specifically for the benefit of MBRE (*id.* at 66:9-22) and that he "facilitated

and coordinated" investor meetings in Chicago in connection with MBRE's attempts to raise

capital.  (*Id.* at 68:19-69:10.)  Knorr's efforts are a relevant factor, as they enhance MBRE's

contacts with Illinois, but no matter how much of his own activity he points to, Knorr cannot

"obtain jurisdiction over [MBRE] by bustling about in his own state, however energetically."

*See Stauffacher v. Bennett*, 969 F.2d 455, 458 (7th Cir. 1992); *Clearing Corp. v. Fin. and Energy

Exch. Ltd.*, 2010 U.S. Dist. LEXIS 14027, at *13 n.4 (N.D. Il. Feb. 18, 2010) (Zagel, J.)

("Plaintiff's performance of a service in Illinois alone is not dispositive . . . but is a factor to be

weighed.").  Knorr must connect MBRE to Illinois through its own activities, not merely through

his own. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This leads to Knorr's second argument.

*Second*, Knorr argues that Dortch conducted enough business in Chicago on behalf of MBRE to underwrite personal jurisdiction. Dortch is a director of MBRE. (Decl. Dortch ¶1.) A director is an agent of the corporation whose actions in that capacity give rise to jurisdictional contacts for the corporation. *See Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 969 (N.D. Il. 2002) (St. Eve, J.) (directors are agents of corporation); *First National Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 910 (N.D. Il. 2006) (Guzman, J.) (agent's actions attributable to principal for purposes of jurisdiction). Dortch admits that he put MBRE's business on the table during at least some of the Chicago meetings. (Decl. Dortch ¶15.) MBRE stresses, however, that this was relatively "infrequent" and that Dortch was usually in Chicago to conduct business for the Operating Companies. It is impossible to say just how frequently MBRE was the proper subject of the parties' dealings, but the record does show that development of Parcels B-E was on the minutes for at least one meeting attended by Knorr and Dortch, among others, on January 21, 2005 in Knorr's office. (Dep. Knorr, Exh. D at D0004546.) The parties agree that the initial phase of Roco Ki was centered on Parcel A and the objectives of the Operating Companies, and that the development of MBRE came into sharper focus later on. Indeed, MBRE was not even incorporated until approximately two years into the development of Parcel A. (Dep. Knorr at 62:10-63:7.) So it is natural to expect that the Chicago meetings would, on the whole, slant in favor of the Operating Companies' business, not MBRE's. Knorr agrees that this was the case. (*Id.* at 71:8-13.)

MBRE puts more weight on these facts than they can bear. True, Dortch's activities in Chicago were more often within the scope of the Operating Companies' business than MBRE's,

but it does not follow that Knorr cannot make a threshold showing that MBRE had sufficient contacts in Illinois to underwrite jurisdiction—as if contacts need only be tallied, without qualitative assessment. *See Int'l Shoe Co.*, 326 U.S. at 319 (jurisdiction depends on "quality and nature" of activity, not whether it is "a little more or a little less"). Everything depends on what Dortch did, not how many times he set foot on Illinois soil wearing his MBRE hat.

In his brief, Knorr recites a litany of Dortch's meetings in Illinois, and in doing so, he loses sight of the basic principle that personal jurisdiction is a defendant-specific inquiry. Knorr points out that Dortch met with representatives from Communique, OBM Architects, M. Silver Associates, Starwood Hotels, and Applied Technology Management. These companies all signed contracts with, or submitted proposals to, MBR rather than MBRE. (R.105, Exhs. E-2 (MBR-Communique Agreement), E-4 (Applied Technology Management Proposal for Consulting Services to MBR), E-5 (MBR Public Relations Program presented by M. Silver Associates), E-6 (OBM Proposal for MBR), E-7 (Assignment and Assumption Agreements between Starwood and MBR).) None of these engagements can even be imputed to MBRE.

Knorr also points to an agreement that MBRE reached with RainMaker Securities, a Chicago based investment firm that was among the potential investors Knorr hosted at his office. (Dep. Knorr, Exh.D at D0002845-98.) The record confirms Knorr's contention that Dortch met with RainMaker in Chicago in early April 2006. (*Id.* at D0002844, D0002898.) MBRE engaged RainMaker to raise capital in exchange for a fifty percent equity interest in the company. But the details of the arrangement, or even the fact that RainMaker never raised any money whatsoever for MBRE (Dep. Dortch at 115:6-9) are neither here nor there—unless Knorr can explain how a contract between MBRE and a third party creates specific jurisdiction in the present suit. It is not enough that Knorr hosted RainMaker and other investors at his office; at best, this might

show that the contract between MBRE and RainMaker was at the outer reaches of the "general relationship" between MBRE and Knorr. Even that is dubious, and in any event, it would still not suffice. *See RAR*, 107 F.3d at 1277-79.

Lastly, MBRE points out that no contracts have been undertaken in connection with its land, on which there has been precious little development: only a main entrance, an access road, and an Infrastructure Center that services Parcel A have been built, and these costs were billed to the Roco Ki Operating Companies, not MBRE. (Dep. Dortch ¶¶13-14.) Beyond that, the only activity involving the MBRE land to date has been a complicated series of "land swaps" that was set in motion by the realization that the Parcel-A land originally slated for the Nick Faldo Signature Golf Course was unusable for its intended purpose. (Dep. Crum at 143:8-148:3.) The details of this apparently substantial setback for the Roco Ki project are far afield for present purposes; the important point is that whatever talks Dortch and Knorr held in Chicago regarding the development of MBRE land via Knorr's "comprehensive master plan" could only have been preliminary. No contracts, no performance, no continuing obligations between the parties resulted from the talks, and the MBRE land continues to lie fallow. Talks between Knorr and Dortch therefore yielded, at best, attenuated contacts for MBRE. *See Wisc. Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676, 678 (7th Cir. 1980) (preliminary talks were substantial contact because they were "significant in the formation of the contract and [the defendant's] efforts to have it satisfactorily performed"); *Abbot Labs., Inc. v. Biovalve Techs., Inc.*, 543 F. Supp. 2d 913, 922 (N.D. Il. Feb. 12, 2008) (Pallmeyer, J.) ("Illinois courts appear to hold that a visit to Illinois does not establish a substantial connection to the state . . . if any substantive negotiations that occur during the visit fail to result in a contract between the parties.").

As a general rule, then, preliminary talks that do not result in the transaction of business

do not give rise to personal jurisdiction. It is not hard to see why. A party that has not engaged an in-state plaintiff in any concrete business dealings usually has not availed itself of the benefits of doing business within the forum; mere physical presence—for preliminary talks or for anything else—is neither necessary nor sufficient for jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *Wisc. Elec. Mfg.*, 619 F.2d at 678 nn.6 & 8. That does not mean that failure to consummate a deal after preliminary talks always precludes specific jurisdiction. A plaintiff might, for instance, sue to recover costs it incurred on behalf of the defendant in preparation for the anticipated deal. *See Citadel Group*, 536 F.3d at 762. Or the plaintiff might claim a fee in connection with the negotiations. *See Coco*, 302 F.3d at 710. Neither is the case here, and Knorr does not even try to identify any other plausible limitation to the general rule. He rests his case on physical presence and his own provision of services. Since due process requires more, the court concludes that it lacks jurisdiction over MBRE.

### *Minimum Contacts: Resort Resources ("Resources")*

Knorr contends that jurisdiction over Resources can be based on the activities of Dortch and Caldwell in Chicago. To begin with, Knorr must show that these activities were within the scope of Resources' corporate functions, which are not in dispute. Dortch testified that Resources was incorporated to "manage payroll and allocate common expenses for the Roco Ki project." (Decl. Dortch ¶8.) Knorr testified that Resources' function is to provide "financial services, accounting and so on for the overall project." (Dep. Knorr at 265:18-21.) The court agrees that Resources conducted enough of these activities in Chicago to subject it to personal jurisdiction.

*First*, since Dortch is a director of Resources (Decl. Dortch ¶1) his actions on its behalf give rise to jurisdictional contacts for the corporation. *See Shapo*, 246 F. Supp. 2d at 969; *First*

*National Bank*, 447 F. Supp. 2d at 910. Dortch's presence in Chicago is not disputed; by his own estimate, he came roughly fifteen to twenty times on Roco Ki business. (Dep. Dortch at 62:14-15). He spent enough time at Knorr's office to need his own key card. (Dep. Knorr at 135:11-16; Dep. Dortch at 70:13-71:6.) But Dortch insists that these visits were on behalf of the Roco Ki Operating Companies and that he did nothing in Chicago for Resources. (*Id.* at 110:6-9.)

Knorr contends that Dortch was present in Chicago on behalf of Resources—among other Geostar subsidiaries—but when asked in his deposition how he knew this, Knorr admitted, "I don't know." (Dep. Knorr at 261:3-5.) Knorr did testify that Dortch reviewed monthly draws and invoices from the Master Builder Project Accounting Software with Caldwell in Chicago before sending the bills to Guernsey to be paid. (*Id.* at 231:8-16.) That's about all Knorr could muster by way of specific activities by Dortch that were at least colorably on behalf of Resources. Jurisdiction requires more.

*Second*, Knorr identifies Caldwell's activities in Chicago as a source of jurisdictional contacts for Resources. Resources argues, in turn, that Caldwell's actions cannot provide a basis for jurisdiction because he was an independent contractor—"an outside consultant for Resort Resources"—rather than a full-blooded agent of Resources or any other Geostar subsidiary. (R.102, Moving Defendants' Second Updated Memorandum at 11.)[4] Resources misconstrues the law, and their argument fails.

Seizing on § 2-209(a) of the Illinois long-arm statute, Resources argues that only the in-state presence of an out-of-state corporation's *agent* can give rise to jurisdictional contacts. *See* 735 ILCS 5/2-209(a) ("Any person, whether or not a citizen or resident of this State, who in

_____

[4] In their reply brief, however, the Moving Defendants assert that Caldwell was "an outside consultant to the Roco Ki Operating Companies, not Resources." (R.105, Moving Defendants' Second Updated Reply Brief, at 11.) As evidence, they cite only ¶¶24-28 of Dortch's declaration, which does not come anywhere close to establishing—or even asserting—the claim put forth here. Therefore, the court cannot credit this assertion.

person or through an agent does any of the acts hereinafter enumerated . . . .").  This argument is too quick; § 2-209(a) does not exhaust the provisions of the Illinois long-arm statute.  § 2-209(c), the so-called catch all provision, permits an Illinois court to exercise specific jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."  *See id.* 5/2-209(c).[5]  The question, then, is whether due process requires a corporation's jurisdictional contacts to arise from the in-state activities of its own full-blooded agents, as opposed to the activities of independent contractors conducting business for the corporation within the forum state.  It does not.

By dispatching independent contractors to do its bidding in a forum state, a corporation can acquire sufficient contacts for the forum's exercise of personal jurisdiction to comport with due process.  This much follows as a corollary to the Supreme Court's holding in *Quill Corp. v. North Dakota*, 504 U.S. 298, 306-08 (1992).  In *Quill*, the Court held that due process allows a state to impose a use tax on an out-of-state corporation that solicits business in the state entirely by mail, with no physical presence in the forum at all.  Two aspects of the Court's analysis in reaching that conclusion are salient here.  *First*, in interpreting the due-process requirement on taxation—namely, that there be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax"—the Court applied personal-jurisdiction precedents and concluded that "comparable reasoning" compels parallel results in the two contexts.  *See id.* (applying *Burger King*, 471 U.S. 462; *Shaffer v. Heitner*, 433 U.S. 186 (1977); *Int'l Shoe*, 326 U.S. 310).  *Second*, the Court noted that a state may impose a use tax on an out-of-state corporation  "despite the fact that all of the seller's in-state solicitation was performed by independent contractors."  *Quill Corp.*, 504 U.S. at 306 (citing *Scripto, Inc. v. Carson*, 362 U.S.

---

[5] Knorr specifically argues that the court has jurisdiction pursuant to § 2-209(c).  (R.104, Plaintiff's Second Updated Response Memorandum, at 7.)

207 (1960)).  By the same "comparable reasoning," a state may assert personal jurisdiction over

an out-of-state corporation even though it employs independent contractors to conduct its

business within the forum.

The contrary result would be in considerable tension with the fundamental principle that

personal jurisdiction turns on whether the defendant has "purposefully avail[ed]" itself of the

benefits of conducting business in the forum state.  *See Hanson*, 357 U.S. at 253.  Thus it is no

longer necessary for a corporation to be physically present before the forum may exercise

personal jurisdiction, provided that the defendant has purposefully targeted the forum as a place

to conduct business.  *See Burger King*, 471 U.S. at 476 ("Jurisdiction in these circumstances may

not be avoided merely because the defendant did not *physically* enter the forum state.").  Sending

independent contractors to conduct the corporation's activities is one way to target a forum, and

a good way to limit the corporation's liability for what happens there.  But liability is one thing,

jurisdiction is quite another; and allowing a corporation to insulate itself from jurisdiction by the

simple expedient of sending independent contractors to the forum would trample over the

principle that a corporation's own presence in the forum is no longer a *sine qua non* of personal

jurisdiction.  Just as a parent corporation cannot insulate itself from a state's jurisdiction merely

by separately incorporating its sales force or other operations for that state, *IDS Life Ins.*, 136

F.3d at 540, a corporation cannot avoid jurisdiction merely by hiring independent contractors to

conduct its business wherever it would prefer not to defend suit.  *See Clearing Corp.*, 2010 U.S.

Dist. LEXIS 14027, at *13 n.4 ("sen[ding] independent contractors" into forum state creates

jurisdictional contacts); *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 445 N.E.2d 1303,

1306 (Ill. App. Ct. 1983) (*aff'd* 466 N.E.2d 217 (1984)) ("The fact that [defendant's] sales were

conducted indirectly through a third party does not excuse [it] from the jurisdiction of Illinois

courts.").  Resources takes too narrow a view of a forum's grounds for exercising personal jurisdiction over an out-of-state corporation.

As for Caldwell, then, Resources does not dispute Knorr's claims that he was employed to manage all "financial records, disbursements, loan documents and keep track of all that," or that he came to Chicago to receive training from Knorr in "accounting functions" on the Master Builder Project Accounting Software.  (Dep. Knorr at 253:13-16; 281:16-282:2; Dep. Dortch at 130:11-14.)  Caldwell rendered financial advice and prepared documentation for Geostar in connection with promissory notes and loans (*id.* at 133:19-135:2) all of which is well within the function of a "financial" or "financially oriented" consultant to the accounting and financial-services arm of the Roco Ki operation.  (*Id.* at 65:6-11.)  Crum also testified that Caldwell performed accounting services, including reviewing payments made in connection with Roco Ki, in Chicago.  (Dep. Crum at 81:20-82:3.)  Knorr has made a *prima facie* showing that Caldwell's activities in Chicago were within the scope of Resources' financial and accounting functions; these contacts may therefore be imputed to Resources for jurisdictional purposes.

Caldwell's activities in Chicago provide a sufficient basis for jurisdiction over Resources.  Resources "purposefully avail[ed] itself of the privilege of conducting activities" in Illinois, *see Hanson*, 357 U.S. at 253, and "should [have] reasonably anticipate[d] being haled into court" in Illinois in connection with any disputes that arose from its activities there.  *See Burger King*, 471 U.S. at 476.  By Resources' own estimate, Caldwell was dispatched to Illinois somewhere between twenty and thirty times, for a total of fifty to seventy five days, from the time Dortch brought him on board in June 2005.  (Dep. Dortch at 62:14-15, 68:12-23; Dep. Knorr, Exh. C, at P0000952.)  That density of contact is more than enough to underwrite jurisdiction.  *See Colletti v. Crudele*, 523 N.E.2d 1222, 1229 (Ill. App. Ct. 1988) ("an approximate average of a dozen trips

a year to and from" a client in Illinois was sufficient). And despite Resources' protestations that Caldwell is merely a "third party," this is surely not a case where a defendant's contacts with the forum were forged by the "random," "fortuitous," or "unilateral activity of those who claim some relationship with a nonresident defendant." *See Hanson*, 357 U.S. at 253; *Keeton*, 465 U.S. at 774. Not even Resources suggests that Caldwell traveled to Chicago unilaterally, and emails from Dortch and Nick Tawil (Resources' other director) announcing Caldwell would easily refute that suggestion anyhow. (Dep. Knorr, Exh. C, at P000796, P000952.)

Dortch's allegation that Resources "has done no business whatsoever with plaintiffs" is therefore unavailing. (Decl. Dortch ¶8.) Resources' "business" was to provide financial and accounting support for the Roco Ki project as a whole, and not, for instance, to buy or sell land parcels, or build hotels, or market residential properties, or do anything that might require it to obtain direct services from an architectural and real-estate-development firm. Caldwell frequently came to Chicago to perform the functions charged to Resources; hence, Resources conducted its business there. The court concludes that Resources' minimum contacts subject it to specific jurisdiction in Illinois.

### Nexus Between Defendants' Contacts and Knorr's Complaint

Geostar and Resources argue that even if they have minimum contacts with Illinois, there cannot be specific jurisdiction in this case because Knorr's cause of action is unrelated to those contacts. The court disagrees.

"[S]pecific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *RAR*, 107 F.3d at 1277 (quotation and citation omitted). Thus, "in a breach of contract case, it is only the dealings

between the parties in regard to the disputed contract that are relevant to the minimum contacts analysis." *Id.* However, "past contacts involving the forum state" are "relevant for personal jurisdiction" when they "either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *Id.* (citations omitted).

Knorr's suit concerns, in the first instance, the settlement agreement he reached with Geostar and several of the subsidiary defendants. As the initial (Parcel A) phase of the Roco Ki project unfolded, disputes arose between Knorr and the defendants concerning "the development, financing, and overall management of the Roco Ki development." (First Amend. Compl. ¶34.) The parties mediated their disputes before Judge McQuade and reached a settlement agreement in Ohio in April 2007. (*Id.* ¶35.) The settlement provided, among other things, that Knorr would receive $40,000,000, plus a beachfront estate and one or two marina slips at Roco Ki, for his equity interests and intellectual property in the Roco Ki project. (*Id.* ¶¶38-40.) Knorr alleges that several defendants (including Geostar but not Resources) breached the settlement agreement by failing to make the required payments and by "exercising exclusive control over RKI's Intellectual Property" without performing their end of the bargain. (*Id.* ¶¶41-44.) He also alleges that all of the defendants committed constructive fraud by falsely representing that they had the capacity to perform the settlement agreement and by engaging in a coordinated scheme to deplete the assets from which the agreement should have been performed. The question is whether the parties' past course of dealing in Chicago is relevant, for purposes of specific jurisdiction, to an action asserting these (and other) claims. It is.

Geostar and Resources rely on *Dragor Shipping Corp. v. Union Tank Car Co.* for the proposition that antecedent dealings between the parties to a settlement agreement are unrelated to a suit for breach of that agreement. 361 F.2d 43, 44 (9th Cir. 1966). Under *Drager*, only facts

relating to the execution and (lack of) performance of the settlement agreement are relevant to specific jurisdiction. *See id.* Geostar and Resources contend that these facts have nothing to do with Illinois and therefore conclude that their prior contacts with Illinois "might be the source of some other lawsuit against them, but they are not the source of the suit [Knorr and RKI] are presently prosecuting." (R.102, Moving Defendants' Second Updated Memorandum, at 9.)

The implication of *Drager* is that, as far as specific jurisdiction is concerned, a settlement agreement does not arise out of the antecedent dispute(s) it was meant to settle. Illinois courts do not apply this perplexing rule. In *Bolger v. Nautica Int'l, Inc.*, the plaintiff sued for breach of a settlement agreement the parties had reached in connection with a boat sale gone awry. *See* 861 N.E.2d 666, 668 (Ill. App. Ct. 2007). With respect to specific jurisdiction, the court rejected the plaintiff's argument "that the focus should be on the settlement agreement, and not the initial contract," explaining that "the settlement agreement arose out of . . . the purchase agreement." *Id.* at 672. Thus, the prior course of dealing between the parties to a settlement agreement can give rise to minimum contacts in a subsequent suit for breach of that agreement. *Drager* is not good law in Illinois.

*Drager* is also inconsistent with the Seventh Circuit's instruction that antecedent dealings between the parties are related to a subsequent breach-of-contract suit if they "inform the court regarding the economic substance of the contract." *See RAR*, 107 F.3d at 1277. When the contract at issue is a settlement agreement, and the prior dealings at issue encompass the dispute(s) that gave rise to the settlement, this requirement is obviously satisfied. Such is the case here: this suit arises from an agreement intended to settle disputes that arose between parties as they conducted extensive business with one another in Chicago. Their dealings in Chicago are therefore relevant contacts for purposes of this suit. This court has specific jurisdiction over

Geostar and Resources.

## CONCLUSION

For the foregoing reasons, the court DENIES the motions to dismiss for lack of personal jurisdiction as to Geostar, Inc. and Resort Resources, Inc. and GRANTS the motions as to Macao Development Company and Macao Beach Real Estate, Inc..


Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: March 30, 2010**